UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

KEWEENAW BAY INDIAN
COMMUNITY, a federally-recognized
Indian tribe, on its own behalf and as *parens*
*patriae* for its members,

                           Plaintiff,                         Case No. 2:05-CV-224

v.                                             HON. GORDON J. QUIST

ROBERT J. KLEINE, Treasurer of the State
of Michigan; JAY RISING, former Treasurer
of the State of Michigan; MICHAEL
REYNOLDS, Administrator of the Collection
Division of the Michigan Department of
Treasury; WALTER A. FRATZKE, Native
American Affairs Specialist of the Michigan
Department of Treasury; and TERRI LYNN
LAND, Secretary of State of Michigan,

                           Defendants.
_____/

## **OPINION**

      Plaintiff, Keweenaw Bay Indian Community ("Community"), brought this claim against

Defendants, Robert J. Kleine, Treasurer of the State of Michigan; Jay Rising, former Treasurer

of the State of Michigan; Michael Reynolds, Administrator of the Collection Division of the

Michigan Department of Treasury; Walter A. Fratzke, Native American Affairs Specialist of the

Michigan Department of Treasury; and Terri Lynn Land, Secretary of State of Michigan.  The

Community alleges that the State of Michigan ("State") has illegally enforced the Michigan Sales

Tax Act, M.C.L. §§ 205.51-205.78, and the Michigan Use Tax Act, M.C.L. §§ 205.91-205.111,

against Community members and those who sell tangible personal property to Community members.

The parties filed various motions for summary judgment, and the Court has heard oral argument. For the following reasons, the Court will grant summary judgment for Defendants on all counts.

## I. Background

The facts upon which this decision is rendered are undisputed. The Community is a federally-recognized Indian tribe located in the Upper Peninsula of Michigan. The Community exercises powers of self-governance and sovereign jurisdiction over the L'Anse Indian Reservation and other lands held in trust for the Community by the United States outside the Reservation. Defendant Robert Kleine is the Treasurer of the State of Michigan, replacing Defendant Jay Rising on April 6, 2006. Kleine oversees the Michigan Department of Treasury ("Treasury"), the State agency that administers and enforces the Sales and Use Tax Acts. Defendant Michael Reynolds is the Administrator of the Collections Division of the Department's Financial Services Bureau. Defendant Walter Fratzke is the Department's Native American affairs specialist, and he oversees the administration of the State's tax laws with respect to Michigan Indian tribes and tribal members. Defendant Terri Lynn Land is the Secretary of State of Michigan, and she administers various programs and services, including motor vehicle registration, licensing, and the collection of certain taxes and fees.

In 1977, the State and the Community entered into an agreement concerning taxes for the Community and its members. The agreement terminated in 1997. Prior to its termination, the State began negotiating with all federally-recognized Native American tribes in the State to enter into comprehensive tax agreements covering all relevant tax issues. Although the State has entered into agreements with a majority of tribes, the Community and the State have thus far failed to reach an agreement.

In 1995, Treasury audited the Community's sales and use taxes for the 1993 and 1994 fiscal years.  Treasury determined that the Community owed $186,277.  In 1996, Treasury offset $87,839 of the Community's tax liability from funds owed to the Community by the State pursuant to the 1977 tax agreement.  At the Community's request, an informal conference to dispute the tax assessments was held on May 14, 2002, but a Community representative was not present.  The Community claims that its representative attempted to participate by telephone but that when he called, no one was able to connect him to the proceedings.  Treasury Hearing Referee Mark Meyer issued an Informal Conference Recommendation in which he determined that the taxes were lawfully owed under the 1977 tax agreement.  On September 20, 2002, Treasury issued a Decision and Order of Determination accepting Referee Meyer's recommendation and ordered that the taxes be assessed.

In November 2002, the State Treasurer's Accounts Receivable ("STAR") computer system automatically offset federal and state funds owed to the Community as a credit against the Community's tax liability.  This offset occurred without warning to the Community.  The Community contacted Defendant Fratzke to contest the offset, and Defendant Reynolds reversed the offset and refunded the money to the Community.  Defendant Reynolds placed the Community's account on manual bypass status, which was supposed to prevent similar offsets in the future.

In May and June of 2005, the STAR computer system once again offset money owed to the Community as a credit against the Community's tax liability.  The STAR computer system took this action without input from any Defendant, and it is unclear what caused the computer system to disregard the Community's "bypass" status.  The offset deprived the Community of federal funds it otherwise would have received.  Specifically, STAR offset $4,157.61 payable to the Community for purposes of the Federal Medicaid Program, 42 U.S.C. § 1396, $28,670.42 payable for the Federal

Women, Infant, and Children Program, 42 U.S.C. § 1786, $410.00 payable for the Federal Safe and Stable Families Program, 42 U.S.C. § 629, and $928.28 payable for the Federal Child Day Care Program, 42 U.S.C. § 618. The remaining amount was offset from State funds owed to the Community. This offset satisfied the Community's tax liability for the 1993 and 1994 assessments. The Community again contested the offsets. At this same time, the Community notified Defendants that it intended to recoup the amount of the 2005 offsets by withholding a portion of the 8% gambling net win payments it was obligated to make to the Michigan Economic Development Corporation under the terms of a 2001 Consent Judgment. As Defendants were deciding whether to refund any portion of the 2005 offsets, the Community filed this lawsuit.

In addition to contesting the validity of the 1993 and 1994 tax assessments and the resulting offsets, the Community also contends that the State's current taxation scheme for sales and use tax is illegal as applied to the Community and its members. The Sales Tax Act, M.C.L. §§ 205.51-205.78, imposes a tax "upon all persons engaged in the business of making sales at retail, by which ownership of tangible personal property is transferred for consideration. . . ." M.C.L. § 205.52. The Use Tax Act, M.C.L. §§ 205.91-205.111, imposes a tax "on the privilege of using, storing, or consuming tangible personal property in this state. . . ." M.C.L. § 205.93(1). The use tax does not apply to property for which sales tax has been paid. M.C.L. § 205.94(1).

For tribes that do not have a tax agreement with the State, Treasury uses a case-by-case analysis to determine if the transaction at issue is subject to tax. Treasury instructs all retailers to charge the applicable tax (unless there is another, generally applicable exemption). If the retailer or purchaser believes the transaction is tax-exempt under federal law governing taxation of Indians, that person may submit a written request for an exemption to Treasury. Treasury requires any person claiming an exemption based on tribal sovereignty to provide information that includes,

4

among other things: whether the party making the request is a federally recognized Indian tribe, a tribal entity, or a member of a federally recognized Indian tribe; if the applicant is a federally recognized Indian tribe, a description of the unit purchasing the item, such as the police department or a commercial enterprise owned by the tribe; the item being purchased and the location of the retailer's business; the place where each component of the sale will take place (e.g. place of solicitation, contract signing, payment, and delivery); and where the item is intended to be used (i.e. exclusively within Indian country or both inside and outside of Indian country).  A retailer or purchaser may obtain approval prior to the transaction or may pay the applicable tax and then seek a refund.

In this 33-count lawsuit, the Community sued Defendants in their official and individual capacities alleging various violations of federal law that can be grouped into four broad categories. First, the Community claims in counts I-V, VII-VIII, and XXVII-XXX that the 1993 and 1994 tax assessments, as well as the resulting 2005 tax offsets, were unlawful for various reasons.  The Community seeks a declaration that the assessments and offsets were unlawful, restoration of the offsets, and a declaration that any future offsets (or other attempts to collect the 1993 and 1994 tax assessments) would be unlawful.  Second, in counts VI and XXXIII, the Community asserts a  42 U.S.C. § 1983 claim, as well as a claim for attorney's fees, against Defendants for their actions relating to the 2005 offsets.  The Community claims that by offsetting federal funds owed to it, Defendants violated various constitutional and statutory rights.  Third, the Community alleges in counts IX-XXVI that Defendants' enforcement of the Sales and Use Tax Acts violates federal law. Finally, in count XXXI, the Community seeks a declaration that its own offset of funds is lawful. Both parties have moved for summary judgment.

5

## II.  Analysis

### *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*  The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### *Sovereign Immunity*

Defendants contend that the Community's claims against them are barred by the Eleventh Amendment.  The Eleventh Amendment provides that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  The amendment bars "not only suits against a state by citizens of another state, but also suits against a state by that state's own citizens."  *MacDonald v. Vill. of Northport*, 164 F.3d 964, 970 (6th Cir. 1999).  The Eleventh Amendment applies to suits brought by Indian tribes.  *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 782, 111 S.Ct. 2578, 2583 (1991).

The "Eleventh Amendment also prohibits some suits against state officials."  *MacDonald*, 164 F.3d at 970.  This is because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different

6

from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312 (1989). The rule derives itself from the reasoning that "the Tenth and Eleventh Amendments bar suits in federal court when the action is 'in essence one for the recovery of money from the state and the state is the real, substantial party in interest,' which invariably will be the case when the claimant sues a state employee in his official capacity." *Skinner v. Govorchin*, 463 F.3d 518, 524 (6th Cir. 2006) (quoting *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1356 (1974)). Thus, "the general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908 (1984) (quoting *Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 1053 (1963) (*per curiam*)). The Eleventh Amendment also prohibits declaratory judgments that a state official violated federal law in the past when there is no threat of future violations. *Green v. Mansour*, 474 U.S. 64, 73, 106 S.Ct. 423, 428 (1985).

In contrast, the Eleventh Amendment is not a bar when defendants are sued in their individual capacities. Because 42 U.S.C. § 1983 provides a cause of action against Defendants in their individual capacities, the Eleventh Amendment does not prohibit the Community from claiming in count VI that Defendants violated federal law by their involvement in the 2005 offsets. *See Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003). The Community's remaining claims against Defendants in their official capacities are, however, barred by the Eleventh Amendment absent an exception.

One exception relevant to the present case was recognized by the Supreme Court in *Ex parte Young*, 209 U.S. 123, 158-159, 28 S.Ct. 441, 453 (1908), which held that "a state official sued in his official capacity for prospective equitable relief 'is generally not regarded as "the state" for purposes of the Eleventh Amendment and the case may proceed in federal court.'" *MacDonald*, 164

7

F.3d at 970 (quoting *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1188 (10th Cir. 1998)).  The Court reasoned that "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in ensuring the supremacy of that law."  *Green*, 474 U.S. at 68, 106 S.Ct. at 426.  Thus, "[s]uits that seek prospective relief are deemed to be suits against the official, while suits that seek retroactive relief are deemed to be suits against the state."  *MacDonald*, 164 F.3d at 971.

The *Ex parte Young* doctrine "has been focused on cases in which a violation of federal law by a state official is *ongoing* as opposed to cases in which federal law has been violated at one time or over a period of time in the past. . . ."  *Papasan v. Allain*, 478 U.S. 265, 277, 106 S.Ct. 2932, 2940 (1986) (emphasis added).  Therefore, "[r]elief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant."  *Id.*  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Maryland Inc. v. Pub. Serv. Comm. of Maryland*, 535 U.S. 635, 645, 122 S.Ct. 1753, 1760 (2002).

The Community's claims challenging Defendants' enforcement of the Sales and Use Tax Acts can proceed under the *Ex parte Young* exception.  The Community seeks declaratory relief concerning future enforcement of sales and use taxes.  The conduct alleged is continuing in nature, and the relief sought is prospective.  Thus, the Eleventh Amendment does not bar the Community from asserting that Defendants are violating federal law in their application of the Sales and Use Tax Acts.  Likewise, the Eleventh Amendment does not bar the Community's claim that it has the right to perform its own offset, for it too is prospective.

However, the Community's claims concerning the 1993 and 1994 tax assessments, and the 2005 offsets, are different.  To assess whether the Eleventh Amendment bars these claims, it is necessary to distinguish the two forms of relief the Community is seeking: (1) a declaration that the tax assessments and offsets were invalid and an order restoring those offsets; and (2) a declaration that future offsets from federal funds, or any other efforts to collect the 1993 and 1994 tax assessments, would be unlawful.

The Community's attempt to have this Court declare the past assessments and offsets as invalid and to reverse those offsets would operate against the State and be paid from the State treasury.  Contrary to the Community's argument otherwise, it is nothing less than an attempt to collect money.  Defendants do not hold this money for the Community's benefit in a trust, constructive or otherwise.  Furthermore, a declaration as to the past assessments and offsets does not go to prospective relief.  In reality, the Community is asking this Court to declare an official act taken in the past to be a violation of federal law and to reverse the consequences of that act.  There is no ongoing violation of federal law respecting the prior assessments and offsets; they have already occurred and are not continuing.  Therefore, the Eleventh Amendment bars the Community from seeking restoration of the prior offsets.

In contrast, a declaration regarding future offsets meets the requirements of *Ex parte Young* because it is prospective relief sought to prevent future conduct that allegedly violates federal law.  Therefore, the Eleventh Amendment does not bar the Community from requesting this relief concerning future offsets and further efforts to collect the 1993 and 1994 taxes.

### Standing

"Standing is an aspect of justiciability, and a plaintiff must demonstrate standing for each claim he seeks to press."  *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 652 (6th

Cir. 2007) (internal quotation and citation omitted).  To meet the constitutional requirements of standing, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-181, 120 S.Ct. 693, 704 (2000).  In a declaratory judgment action, the first element of standing asks the Court to consider "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959-960 (1969).  Moreover, "allegations of past injury alone are not sufficient to confer standing.  The plaintiff must allege and/or 'demonstrate actual present harm or a significant possibility of future harm.'" *Feiger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006) (quoting *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 411, 527 (6th Cir. 1998)).

On the issue of whether the Community has standing to seek a declaratory judgment that any future offsets from federal funds owed to the Community, or any other attempts to collect the 1993 and 1994 tax assessments, would be unlawful, the Court concludes that the possibility of future offsets is not of "sufficient immediacy and reality" to confer standing on the Community.  Primarily, the 2005 offsets satisfied the Community's tax liability for the 1993 and 1994 assessments.  Thus, absent a tax liability by the Community, there is no threat that Defendants will seek to collect any more taxes through offsets or other means.  The Community, in an attempt to argue around this jurisdictional bar, responds that Defendants have engaged in numerous offsets in the past and will continue to do so in the future.  However, "past exposure to illegal conduct does not in itself show

a present case or controversy regarding injunctive relief. . . ." *City of Los Angeles v. Lyon*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-496, 94 S.Ct. 669, 675-676 (1974)).

There has been no showing that the Community has a tax liability.  Absent an assessment by Defendants, Defendants have no reason to conduct future offsets from money owed to the Community.  Until the Community has a tax liability that Defendants could attempt to collect, the possibility of future offsets is – at best – conjectural or hypothetical.  It is plausible that the Community will not have a tax liability in the future.  Even should the Community owe taxes, it is not certain that Defendants will once again collect those taxes through the use of offsets.  Given the speculation regarding this controversy recurring between the same parties in the immediate future, the Court cannot find that the Community demonstrates a "significant possibility of future harm." *Feiger*, 471 F.3d at 643.[1]

In conclusion on this point, the possibility that the State will assert that the Community owes it money, and that Defendants will once again collect that money through offsets, is too speculative

---

[1] The Community argues that this claim is one "capable of repetition, yet evading review."  The "capable of repetition, yet evading review" doctrine is an exception to the mootness doctrine when the claimant can show that:  "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183 (1982) (quoting *Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 187, 99 S.Ct. 983, 991 (1979)).  However, this doctrine concerns mootness, not standing, and thus does not save the Community's claim.  The doctrine of standing asks whether there is a justiciable case or controversy at the time the complaint is filed.  In contrast, mootness occurs when a plaintiff has standing, but some event occurs after the lawsuit was initiated that deprives one of the parties "of a legally cognizable interest in the outcome." *Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 781 (6th Cir. 2007).

In the instant case, the 2005 offsets satisfied the Community's tax liability to the State before the lawsuit was initiated.  Therefore, the Community lacked standing at the time the complaint was filed to seek prospective declaratory relief prohibiting future offsets.  Thus, exceptions to the mootness doctrine will not confer standing on the Community.  This is because "if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum." *Friends of the Earth*, 528 U.S. at 191, 120 S.Ct. at 709.  As such, "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Id.* at 190, 120 S.Ct. at 709.

to support standing for the prospective declaratory relief contained in counts I-V, VII-VIII, and XXVII-XXX.[2]  Because the Community is barred by the Eleventh Amendment from seeking the retrospective relief requested in those counts, the Court will grant summary judgment in Defendant's favor on counts I-V, VII-VIII, and XXVII-XXX.

Likewise, the Community lacks standing to assert its claim in count XXXI that the Community's own offset of funds is a lawful exercise of the Community's set-off rights under tribal law.  The Community lacks standing to assert this claim because there is no "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Golden*, 394 U.S. at 108, 89 S.Ct. at 959-960.  The Community owes this money to the Michigan Economic Development Corporation pursuant to the terms of a 2001 Consent Judgment.  While the Community has withheld this money, there is no evidence that any person or entity is attempting to collect this money.  As such, there is no controversy surrounding the payment of this money that would justify the Court's issuance of a declaratory judgment.  Moreover, even if there were a controversy of sufficient immediacy regarding the money owed, the parties involved in this suit do not have adverse legal interests.  The Community does not owe this money to Defendants, it owes the money to the Michigan Economic Development Corporation.  Thus, whatever future injury could be alleged would not be traceable to any Defendant.  In sum, the Community does not have standing to assert a claim that it can

---

[2]This does not create the situation the Community suggests: that it will never be able to challenge the offsets because they occur instantaneously and automatically satisfy any existing tax liability (assuming the offsets are sufficient to cover the tax assessments).  Without making a ruling on the issue, the Court believes that the Community's standing argument would be significantly stronger if the Community had an existing, outstanding tax liability that would give Defendants the authority to perform future offsets.  Moreover, even though the combination of the Eleventh Amendment and the doctrine of standing prevent the Community from seeking both retrospective and prospective relief concerning the offsets under the facts presented in this Court, federal courts are not the only forum available for contesting the Defendants' actions.

lawfully withhold money to a third-party when that party is not involved in this case and there is no controversy surrounding the money. Therefore, the Court will grant summary judgment in Defendants' favor on count XXXI.

In contrast, the Community has standing to assert its claims under 42 U.S.C. § 1983. The alleged unlawful conduct caused injury to the Community by depriving it of funds it otherwise would have received. This injury is traceable to Defendants, and a favorable decision would redress whatever injury the Community suffered as a result of Defendants' alleged unlawful conduct. Therefore, the Community has standing to assert that Defendants, in their individual capacities, violated federal law through their roles in the 2005 offsets.

Likewise, the Community has standing to assert its claim that Defendants' enforcement of the Sales and Use Tax Acts violate federal law. Defendants argue that the Community lacks standing because the legal incidence of the sales tax falls on the retail seller (and thus not the Community or its members) and because the Community and its members never sought exemptions for specific transactions. While legally accurate, these arguments do not mean that the Community lacks standing to assert this particular claim. The Community alleges that because of Defendants' procedures, it has to pay taxes on activities it claims are immune from state taxation. Although the Community and its members never sought exemptions for particular transactions, the Community can still allege an injury in having to pay the relevant tax unless it requests an exemption from Defendants. Thus, while not seeking exemptions in particular cases may affect the scope of the Community's challenge, discussed below, it does not prevent the Community and its members from challenging the lawfulness of requiring exemptions in the first place.

Additionally, it is immaterial that the legal incidence of the sales tax falls on the retail seller. While that is important in determining the validity of the tax, it does not impact the Court's standing

13

analysis because the tax is routinely passed on to the consumer, and the consumer ultimately ends up paying the tax. This is sufficient to establish an injury for standing purposes. *Sac & Fox Nation of Missouri v. Pierce*, 213 F.3d 566, 573 (10th Cir. 2000) (holding that Indian tribe had standing to challenge a tax even though the legal incidence of the tax fell on the non-Indian retailer). Moreover, the Community's alleged injury in having to pay the taxes or seek an exemption is directly traceable to Defendants' actions in enforcing these taxes. Finally, a decision in the Community's favor would most likely redress its alleged injury. Thus, the Community may proceed with counts IX-XXVI alleging that Defendants' enforcement of the Sales and Use Tax Acts violates federal law.

In sum, the Community lacks standing to seek a declaratory judgment that a future offset of money from federal funds owed to the Community would violate federal law. Likewise, the Community lacks standing to seek a declaratory judgment that it has the right under tribal law to withhold money it owes the Michigan Economic Development Corporation pursuant to a 2001 Consent Judgment. In contrast, the Community does have standing for its § 1983 claim against Defendants in their individual capacities for their involvement in the 2005 offsets. Finally, the Community has standing to challenge Defendants' enforcement of the Sales and Use Tax Acts.

*§ 1983 Claims*

42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

The Community sued Defendants in their individual capacities alleging that by offsetting its supposed tax liability from federal funds, Defendants violated the Fourth Amendment's prohibition against unreasonable searches and seizures, the Fifth Amendment's prohibition against a taking

without just compensation, the Fourteenth Amendment's prohibition against deprivations of property without due process of law, and federal statutory law. In response, Defendants argue, among other things, that the Community is not a "person" within the meaning of § 1983.

Defendants rely upon *Inyo County v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701, 123 S.Ct. 1887 (2003). In *Inyo County*, the county was investigating tribe members for welfare fraud. The county executed a state-court warrant on the tribe for casino employment records kept by the tribe on its reservation. The tribe, alleging a violation of the Fourth Amendment, sued in federal court asserting sovereign immunity from state-court processes. The Supreme Court held that "in the situation here presented, the Tribe does not qualify as a 'person' who may sue under § 1983." *Id.* at 704, 123 S.Ct. at 1890. The Court said that the determination of whether a "sovereign" is a person "who may maintain a particular claim for relief depends not upon a bare analysis of the word 'person,' but on the legislative environment in which the word appears." *Id.* at 711, 123 S.Ct. at 1893 (internal quotations and citations omitted). In *Inyo*, it was "by virtue of the Tribe's asserted 'sovereign' status that it claim[ed] immunity from the County's processes." *Id.* at 712, 123 S.Ct. at 1894. The Court noted that "Section 1983 was designed to protect private rights against government encroachment, not to advance a sovereign's prerogative to withhold evidence relevant to a criminal investigation." *Id.*, 123 S.Ct. at 1894 (internal citation omitted). Thus, the Court concluded the tribe was not a person entitled to sue under § 1983. *Inyo County*, therefore, established the principle that whether a tribe is a "person" under § 1983 depends upon the right the tribe is asserting.

Without reciting each individual paragraph, the common allegations can be characterized as setting forth a series of reasons, including federal law, treaties and agreements, why the tribe and its members are not subject to the sales and use taxes. The State of Michigan sent tax bills to the

15

Community for 1993 and 1994 sales and use tax assessments, and in 2005, Defendants or their

predecessors offset or caused to be offset funds "belonging to the Community and/or its members

to satisfy . . . the 1993-94 Tax Assessments." Compl. ¶ 26.[3] Paragraph 29 of the Complaint is the

penultimate summary paragraph describing what the case is about:

> 29.    The 1993-94 Tax Assessments, the 1996 Audit Offsets, and the 2005
> Offsets have caused and will continue to cause irreparable harm to the Community,
> because they violate the federal rights of the Community and its members, constitute
> a violation of the Community's sovereignty recognized by longstanding federal law,
> threaten the Community's government operations and continued vitality, and
> diminish Community funds and resources available to provide health care, day care,
> other social services, police, natural resources management, education, and other
> essential governmental services for Community members, residents, and visitors, as
> well as to provide employment for Community members.   Moreover, the
> Community's efforts in urging the Department to reverse the 2005 Offsets
> necessarily have diverted funds and other resources away from programs providing
> essential governmental services and employment for Community members.
> Defendants' continued attempts to collect the 1993-94 Tax Assessments and
> continued failure to reverse the 2005 Offsets will further diminish Community funds
> and resources available to provide these services and employment and will delay or
> possibly eliminate these services and employment.  None of these serious and
> potentially devastating harms to the Community can be measured in dollars.

This court can only conclude that despite the many counts, theories, briefs, and arguments,

this case is about the sovereignty of the Community and, also, the sovereignty of the State of

Michigan.  Essentially, this case is a battle between sovereigns in which the Community is relying

upon its sovereign rights to avoid paying the taxes demanded and set off by the State.

The Community's argument that private persons also have Fourth, Fifth, and Fourteenth

Amendment rights obfuscates the nature of the inquiry and ignores the Supreme Court's reasoning

in *Inyo County*.  In essence, the Community argues that it had the right to receive federal money

owed to it under Social Security programs free from the State's appropriation.  However, the

---

[3]"The 2002 offsets are not at issue in this litigation." Compl. ¶ 25.

Community is entitled to these funds only because it is a sovereign.  The funds at issue (money payable to the Community under the Federal Medicaid Program, 42 U.S.C. § 1396, the Federal Women, Infant, and Children Program, 42 U.S.C. § 1786, the Federal Safe and Stable Families Program, 42 U.S.C. § 629, and the Federal Child Day Care Program, 42 U.S.C. § 618) are payable to states – or Indian tribes – not to individuals.  The rights of individuals to receive money under these programs are defined in separate statutory sections.  As such, the Community's right to receive the funds at issue was dependent on its status as a sovereign, similar to the tribe's argument in *Inyo County* that it was immune from state-court processes because it was a sovereign.

In addition, the very basis of the Community's asserted rights is its sovereignty.  An individual would be barred from bringing a § 1983 action in federal court asserting the same rights the Community is asserting here.  The Tax Injunction Act provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341. Additionally, the Supreme Court in *Fair Assessment in Real Estate Assoc., Inc. v. McNary*, 454 U.S. 100, 116, 102 S.Ct. 177, 186 (1981), held that "taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts."  Although the Supreme Court recognized an exception to the Tax Injunction Act for Indian tribes challenging ongoing state taxation schemes – and presumably Indian tribes would be excepted from the bar of comity to the same extent, *see Chippewa Trading Co. v. Cox*, 365 F.3d 538, 545 (6th Cir. 2004) – the fact that an individual person would be barred from asserting the very same right the Community claims supports the Court's conclusion that the Community is not seeking to vindicate a "private right."

17

Because § 1983 was designed to vindicate only private rights, the Community is not a "person" under § 1983 for purposes of the rights at issue in the present case. For that reason, the Court will grant summary judgment in Defendants' favor on the Community's § 1983 claim. Because the Community's right to attorney's fees is dependent on its § 1983 claim, the Court will also grant summary judgment in Defendants' favor on the Community's claim for attorney's fees.

*Sales and Use Tax*

Before assessing the validity of the taxes at issue in the present case, it is necessary to outline the Supreme Court's jurisprudence for when and how a state may impose taxes on transactions that involve Indians.[4] Under the Supreme Court's "Indian tax immunity cases, the 'who' and 'where' of the challenged tax have significant questions. [The Court] ha[s] determined that the initial and frequently dispositive question in Indian tax cases is *who* bears the legal incidence of the tax." *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101, 126 S.Ct. 676, 681 (2006). If the legal incidence of the tax falls on the tribe or its tribal members, then the analysis is fairly straightforward. When the activity occurs within Indian country, states are categorically barred from placing the legal incidence of the tax on the tribe or its members. *Id.* If the activity occurs outside Indian country, then Indians "have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 149, 93 S.Ct. 1267, 1270 (1973). In determining whether the activity being taxed occurs within Indian country, the Supreme Court has looked to where the event occurs that triggers the tax

---

[4]The Community alleges that the taxes at issue are also invalid under an 1842 Treaty between the United States and the Community. The Community argues that because the treaty provides that "the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress," the treaty stripped the states of jurisdiction to tax the Community or its members. However, the 1842 treaty simply makes federal law applicable to the area governed by the treaty. *Keweenaw Bay Indian v. Rising*, 477 F.3d 881, 893 (6th Cir. 2007). Thus, if taxation is permissible under federal law, it is likewise permissible under the terms of the 1842 treaty. *Id.* Therefore, there is no need for the Court to engage in a separate analysis of the 1842 treaty.

liability.  *See Wagnon*,  546 U.S. at 106, 126 S.Ct. at 684 (holding that sale occurred outside of Indian country because it was "the distributor's off-reservation receipt of the motor fuel, and not any subsequent event, that establishe[d] tax liability.").

If the legal incidence of the tax falls on a non-Indian (either retailer or consumer), however, the analysis is different.  Again, if the taxable event occurs outside of Indian country, then a state is free to tax a non-Indian without further analysis.  *Id.*  If the taxable event occurs within Indian country, then a tax on non-Indians is subject to the *Bracker* interest-balancing test.  *Id.*  Under the *Bracker* test, the validity of the tax depends on "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law."  *Dep't of Taxation and Finance of New York v. Milhem Attea & Bros., Inc.*, 512 U.S. 61, 73, 114 S.Ct. 2028, 2035 (1994) (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 100 S.Ct. 2578, 2585 (1980)). Relevant factors include state regulatory or service functions related to the subject of taxation, whether the economic burden of the taxes ultimately falls on the tribe, and whether federal law imposes a regulatory scheme over the subject of taxation.  *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 184, 109 S.Ct. 1698, 1711-1712 (1989).  Finally, where the state is validly imposing a tax for off-reservation use, a state must "tailor[] its tax to the amount of actual off-reservation use, or otherwise var[y] something more than mere nomenclature."  *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 163-164, 100 S.Ct. 2069, 2086 (1980).

Both parties agree that the legal incidence of the sales tax falls on the retail seller.  The Michigan Court of Appeals has held that "the legal incidence of the sales tax falls on the retailer," *Ammex, Inc., v. Dep't of Treasury*, 237 Mich.App. 455, 460, 603 N.W.2d 308, 312 (1999), and the Court agrees because it is the retailer who is liable to pay the tax, and the retailer may, but is not

19

required to, pass the tax on to the Indian consumer, *see Wagnon*, 546 U.S. at 103, 126 S.Ct. at 682. Thus, if the tax is imposed on a "sale at retail" that occurs outside of Indian country, the state is free to tax it even though the tax is ultimately passed on to the Indian consumer.  If the "sale at retail" occurs within Indian country, then the validity of the tax depends on a case-by-case analysis of the *Bracker* interest-balancing test.  For the use tax, however, the inquiry is different.  The legal incidence of the use tax falls on the Indian consumer.  As such, if the use tax arises within Indian country, it is categorically barred.  If it arises outside of Indian country, the tax is valid.  Moreover, under *Colville*, if the tax arises from use outside of Indian country, but some of the use also occurs within Indian country, then the State must tailor the tax only to the off-reservation use.

The Supreme Court has held "that States may impose on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes. . ."  *Milhelm*, 512 U.S. at 73, 114 S.Ct. at 2036.  In *Milhelm*, the State of New York required cigarette wholesalers doing business on Indian reservations to keep detailed records of their transactions so the State could properly assess which transactions were taxable.  Because sales of cigarettes to tribe members were tax-exempt while their sales to non-tribe members were taxable, the Supreme Court held that the record keeping requirements were simply minimal burdens reasonably tailored to the collection of valid taxes.  In *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881 (6th Cir. 2007), the Sixth Circuit approved an even more onerous burden, akin to the instant case.  In *Rising*, the State required the Community to prepay cigarette taxes and then seek a refund from the State for non-taxable sales made to Community members within Indian country.  Although the Sixth Circuit was troubled by the possibility of delay in receiving compensation for transactions exempt from taxation, it held "the refund system to be a permissible means of requiring the Community 'aid the State's collection and enforcement' of valid taxes. . . ."  *Id.* at 893.

The enforcement scheme in the present case is similar in many important aspects to that approved by the court in *Rising*.  Primarily, the taxes at issue cover some transactions and uses that are taxable and some that are tax-exempt.  In an effort to discern the difference, the State, much as in *Rising*, begins with the presumption that all transactions are taxable and then provides an avenue for the Community and its members to seek exemptions for those activities that are tax-exempt. Defendant's plan in the present case is even less-burdensome than in *Rising* because the Community and its members are not *required* to pre-pay the taxes and then seek a refund; rather, they may seek a declaration that an activity is tax-exempt before paying the relevant taxes.

Additionally, the process Defendants have implemented to determine whether a transaction or use should be tax-exempt is reasonably tailored to the collection of taxes for those scenarios that are taxable.  Among other things, Defendants require someone seeking an exemption to identify the item being purchased, from whom and where the item is being purchased, where each component of the sale will take place, where the item is intended to be used, and the unit purchasing the item (e.g. individual tribal member, business, police department, etc.).  As previously discussed, the validity of the sales tax depends on whether the "sale at retail" occurs within Indian country.  If not, it is taxable.  If so, then the validity of the tax depends on the *Bracker* interest-balancing test.  The requested information assists Defendants in making both determinations.  For the use tax, its lawfulness depends on whether the use will occur within Indian country.  If the item will be used exclusively within Indian country, the tax is categorically barred; if it is used exclusively outside of Indian country, the tax is categorically allowed.  If it is used both inside and outside of Indian country, Defendants must in some way tailor or apportion the tax to the off-reservation use.  Again, Defendants' requested information is relevant and reasonably tailored to allow them to make this

determination.  Therefore, Defendants' procedure for collecting sales and use taxes does not violate federal law.

In addition to disputing the validity of Defendants' procedures for assessing taxes and granting exemptions, both parties dispute – and ask this Court to resolve – several additional tax issues involving the Community or its members.  For example, the parties contest when and under what circumstances the purchase of a motor vehicle occurs within Indian country (e.g. whether delivery within Indian country is sufficient).  Also, the parties disagree on whether, and how, Defendants must apportion the use tax for use occurring outside of Indian country.  Finally, the Community also seeks a declaration that certain construction projects were tax-exempt.  However, the Court will decline to resolve these disputes for two reasons: (1) they are not ripe, and (2) the Court exercises its discretion not to resolve these questions at this time.

The Court may raise the issue of ripeness *sua sponte*.  *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808, 123 S.Ct. 2026, 2030 (2003).  The doctrine is "designed 'to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *Kentucky Press Ass'n, Inc. v. Commonwealth of Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580, 105 S.Ct. 3325, 3332 (1985)).  To determine whether a particular issue is ripe for adjudication, courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Lab. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515 (1967).  In determining whether an issue is fit for review, the Court should consider whether the issues involved are purely legal or whether further factual development is necessary for proper adjudication.  *See id*.

The Court considers the remaining disputes not ripe because further factual development is necessary and no hardship will result to either party.  Primarily, the Court is not presented with a specific factual situation in which either the Community or one of its members has sought and been denied a tax exemption.  As such, the Court cannot apply federal law to determine whether hypothetical transactions may or may not be taxable.  It "would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation."  *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 523 (1960).  This is because it "is neither [the Court's] obligation nor within [the Court's] traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop."  *Gonzales v. Carhart*, 127 S.Ct. 1610, 1639 (2007).

Whether a transaction involving an Indian is subject to state taxation is a case-by-case fact-specific analysis.  Although some issues involved may be purely legal (e.g. whether delivery of a motor vehicle within Indian country, without more, qualifies the transaction as occurring within Indian country), other issues require further factual development (e.g. even if a motor vehicle sale occurred within Indian country, whether it is tax-exempt depends on the case-specific *Bracker* interest-balancing test).  The Court will not make abstract pronouncements of law about different types of activities until the Court is presented with a specific purchase or use for which the State has denied a tax exemption.  At that point, a reviewing court can engage in a full analysis of the facts to determine whether the transaction is subject to taxation.  To do otherwise would require the Court to make premature rulings of law applicable to hypothetical facts that may or may not occur in the future.  Moreover, no hardship will result to either party from the Court withholding adjudication of the disputed issues.  If the Community or its members believe a particular activity is tax-exempt and the State disagrees, then the Community may challenge that determination, and the reviewing

23

court can make the necessary rulings to determine whether that particular activity is tax-exempt. Until then, disputes about how federal law would apply to hypothetical facts are not ripe.

Alternatively, assuming that the issues are "ripe," this Court exercises its discretion to refuse to resolve these abstract disputes by a declaratory judgment for the same reasons that this Court posits that the questions are not ripe for resolution.  The Supreme Court has stated that "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*,  515 U.S. 277, 282, 115 S.Ct. 2137, 2140 (1995).  This is because the Declaratory Judgment Act is "'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'"  *Id.* at 287, 115 S.Ct. at 2143 (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct. 236, 239 (1952)).  Therefore, "'the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power.'" *Id.* (quoting *Wycoff*, 344 U.S. at 243, 73 S.Ct. at 240).  This Court is not a regulatory or administrative body equipped to formulate regulations regarding the myriad of issues that might arise between these sides of the dispute.

In summary, the Community is limited to challenging whether Defendants' procedure for administering the Sales and Use Tax Acts complies with federal law.  Because the taxes cover some transactions and uses involving Indians that are tax-exempt and some that are taxable, the State is free to impose minimal burdens on Indians that are reasonably tailored to the collection of valid taxes.  Defendants' practice of requiring payment of taxes absent an approved exemption imposes only a minimal burden on the Community and its members.  Likewise, the information Defendants request to determine whether to grant an exemption is relevant to whether a particular activity is

taxable, and thus, is reasonably tailored to the collection of valid taxes.  Therefore, the Court will grant summary judgment in Defendants' favor on all counts relating to future enforcement of the Sales and Use Tax Acts (counts IX-XXVI).

### III.  Conclusion

For the reasons set forth above, the Court will grant summary judgment for Defendants on all counts.

A separate Order will issue.


Dated:  March 27, 2008                              _____/s/ Gordon J. Quist_____
                                                                        GORDON J. QUIST
                                                                        UNITED STATES DISTRICT JUDGE